FILED
2012 Apr-06  AM 11:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHARLES DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **2:09-cv-02568-AKK** |
| | ) | |
| **AARON'S INC., d/b/a AARON'S** | ) | |
| **SALES AND LEASING,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the court for a bench trial.  Plaintiff Charles Davis ("Davis"), who is African American, contends that his former employer Aaron's, Inc. ("Aaron's"), discriminated against him because of his race.  Accordingly, he filed this claim pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and 42 U.S.C. § 1981, seeking compensatory and punitive damages. Doc. 1.  This court therefore has subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1331.  Moreover, the parties do not contest personal jurisdiction or venue.

## I.      BRIEF FACTUAL BACKGROUND AND CONTENTIONS[1]

On September 27, 2007, Aaron's hired Davis as a management trainee for its Homewood, Alabama store. Doc. 34 at 2-3.  Davis' responsibilities included following up with customers who fell behind in making their rental payments.  *Id.* Davis held this position until March 10, 2008, Tr. 114,[2] when he received a promotion to Customer Account Manager ("CAM").  Doc. 34 at 2-3. On April 30, 2008, Aaron's transferred Davis to its Midfield, Alabama location.  *Id.* Davis worked in Midfield until his discharge on May 27, 2008, for purportedly refusing to make "call-throughs" to references, i.e., calling references of customers as part of Aaron's collection efforts.  *Id.* at 2-4.  Davis challenged his discharge and filed this lawsuit on December 22, 2009, alleging that Aaron's discharged him because of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sections 2000e *et seq*., and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.  Doc. 1.  Aaron's answered on February 12, 2010, and denied Davis' allegations.  Doc. 6.

## II.     LEGAL STANDARD

Because Davis' claim is based on circumstantial evidence, the court applies

---

[1]The factual recitation here contains simply the undisputed facts the parties concede and a brief summary of their respective contentions.
[2]Citations to the trial transcript are noted by the "Tr." prefix.

the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),  burden-shifting framework.  A plaintiff establishes a prima facie case by showing: (1) membership in a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the job; and (4) more favorable treatment of a similarly situated employee outside of his protected class.  *Knight v. Baptist Hosp. of Miami*, 330 F.3d 1313, 1316 (11th Cir. 2003).  However, when a plaintiff claims an "alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) . . . that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct."  *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989); *see also Anderson v. WBMG-42, Parker Commc'ns Inc.*, 253 F.3d 561 (11th Cir. 2001).  A similarly situated employee is one whose "misconduct . . . was nearly identical to that engaged in" by the plaintiff.  *Williams v. Motorola, Inc*., 303 F.3d 1284, 1293 (11th Cir. 2002) (quoting *Nix v. WLCY Radio/Rahall Comm's*, 738 F.2d 1181, 1185 (11th Cir. 1984)).  Moreover, the "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citation omitted).

3

After the plaintiff establishes a prima facie case, "then the defendant must show a legitimate, non-discriminatory reason for its employment action." *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citations omitted). "If it does so, then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Id*. (citation omitted). To show pretext, "the plaintiff may demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the proffered reasons for the employment action such that 'a reasonable factfinder could find them unworthy of credence.'" *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (overruled on other grounds). However, the plaintiff "must meet that reason head on and rebut it" and "cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000). Moreover, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (citations omitted).

## III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard, fully weighed, and considered the evidence and arguments of counsel, the court finds and decides as follows:

4

### A.    Findings of Fact

In addition to the undisputed facts outlined in Section II, the court makes the following factual findings:

1. At the time relevant to this dispute, Ronnie Crumbley ("Crumbley"), Caucasian male, served as regional manager for Aaron's west Alabama region. Tr. 269, 272-74;

2. Aaron's rents merchandise to customers on a month-to-month basis or on a two-week basis.  Tr. 16-17.  At the end of the rental period, if a customer fails to renew automatically, Aaron's calls the customer first to try to get the next payment, i.e., a renewal, or, alternatively, to arrange for the return of the merchandise.  *Id.* at 18;

3. As a management trainee in the Homewood, Alabama store, Davis handled accounts that were 1 - 16 days delinquent: "Basically, I was responsible for selling or reselling lease agreements to customers that were nonrenewed that were within the first 15 days of the nonrenewal stages." Tr. at 128;

4. Crumbley promoted Davis to CAM for the Homewood location on March 10, 2008. Tr. 114, 284-85.  When the Homewood store closed, Aaron's transferred Davis to the Midfield location on April 30, 2008.  *Id.* at 129, 133;

5. As a CAM, Davis' job was to "resell[] the benefits of a timely lease

5

agreement renewal payments." Tr. 245.  Davis was responsible for those

customers who were past the sixteenth day of non-renewal: "The CAM will cover

days like 17 through 31. So any customer that's 17 days or 16-plus days late, up to

about a month out." *Id.* at 129.  In other words, Davis handled accounts that were

17 - 31 days overdue. *Id.* at 129, 289.  Davis received "support from the two

regional CAMs, Gordon McGlocklin and Brian Patton." *Id.* at 130;

6. Customers that have not renewed are placed in a "bucket." When

Davis transferred to Midfield, he inherited a "bucket" that had 60 - 80 individuals.

*Id.* at 136.  Aaron's required Davis and other CAMs to call each customer in their

bucket at least twice a day. *Id; see also* pp. 192-93 (Objective 2 of CAM Big 5,

which states that a CAM must "personally ensure [that] all renewal lists have been

called a minimum two times per day.").  If a CAM is unable to reach a delinquent

customer, the CAM must call the customer's references to track down the

customer. *Id.* at 137, 187.  However, as long as a customer is responsive, then the

CAM does not have to call that customer's references. *Id.* at 187-88, 354.  In

other words, Aaron's uses references as an aid to locate unresponsive customers;

7. Calling references is an important part of a CAM's duties.  Tr. 188.

Aaron's requires CAMs to note their efforts and outcomes in reaching out to

customers and references on the call log. *Id.* at 189;

8. To qualify to rent merchandise, prospective customers must provide at least five references.  Tr. 137, 188.  Aaron's rejects any prospective customer who fails to provide references.  *Id.* at 230.  Before renting to a customer, Aaron's calls the references to notify them that a customer has listed them as a reference and to ask if it is okay for Aaron's to contact them in the event Aaron's cannot get in touch with the customer.  *Id.* at 111-12, 278, 354.  In other words, each reference is an individual who gave Aaron's permission to call.  *Id.* at 230, 354;

9. The calls to customers and, if necessary, to references are "call-throughs."  "A call-through is defined as calling the customer itself [sic] two times a day and references as necessary . . . ."  *Id.* at 240.  Failure to complete the call-throughs could lead to Aaron's losing business.  *Id.* at 189;

10. A store's success is measured in large part on the renewal numbers.  Tr. 193.  The Midfield store had some of the worst non-renewals in the west Alabama region.  *Id.* at 198.  Aaron's tracked the non-renewal rates closely and circulated daily reports through which CAMs can compare their performance to other CAMs in the region and see how they rank.  *Id.* at 135, 199-201;

11. In Midfield, Davis' non-renewal rate ranked at the bottom of the region.  Tr. 203-04.  However, the Midfield store ranked at the bottom before

7

Davis' transfer, *id.* at 250, and never improved: "They were pretty much at the bottom of the barrel every cycle," *id*. at 135; *see also* pp. 287-88.  "That store never really did a whole lot.  They did have a few months where they would make revenue and then a few months where they just didn't, so . . . I don't ever think it really made any kind of profit consistently." *Id.* at 94.  Thus, Davis felt he needed more than a few weeks to improve the non-renewal numbers in Midfield.  *Id.* at 251;

   12. As a CAM, Davis reported directly to Brian Thrash ("Thrash"), the General Manager of the Midfield store.  Tr. 197.  However, Davis dealt extensively with the regional CAMs, McGlocklin and Patton, who oversaw the CAMs in the west Alabama region.  *Id.* at 195-96.  Davis described McGlocklin and Patton as "our initial . . . kind of go-between the higher-ups, and they made sure that everything within the CAM departments operated smoothly." *Id.* at 196.  McGlocklin and Patton visited the stores more often than other members of higher management and worked with the CAMs on the non-renewals.  *Id.* at 196.  They spent the bulk of their time in "store[s] that w[ere] not in compliance," i.e., stores that had a higher percentage of non-renewals.  *Id.* at 197;

Termination

   13. McGlocklin visited the Midfield Store on May 27, 2010, for a

"regular daily store visit."  Tr. 350.  While checking Davis' call list and the call-throughs, McGlocklin noticed "improper call-through[s]" – i.e., that Davis failed to make "a complete call-through per Aaron's policy, calling all the customers and references that are required."  *Id.*;

14. After talking to Thrash, McGlocklin and Thrash decided "to counsel Mr. Davis about [the improper call-throughs]."  *Id.*  Consequently, Thrash prepared a counseling form for Davis by hand.  *Id.* at 350; DX 14.  The goal of the write-up was to "do a written counseling for Mr. Davis to try to use as a coaching tool, training tool, to get back on track and do the correct thing."  *Id.* at 351;

15. Thereafter, Davis received a call to return to the store.  Tr. 147.  When Davis arrived, McGlocklin and Thrash met with him, and McGlocklin presented Davis the write-up for failing to make call-throughs.  According to Davis, he "was told that [he] was not making proper phone calls with regards to references or some references that [he] had not called on [his] morning call-through."  *Id.* at 148.  Also, McGlocklin "questioned [Davis] about [Davis'] selection of which references [Davis] had or had not called."  *Id.* at 214.  McGlocklin had Davis' call list, which "noted which references [Davis] did or did not call."[3]  *Id.*  McGlocklin had previously discussed and verbally counseled Davis

---

[3] Davis admitted at trial that he, in fact, had not called some of the references that morning.  Tr. 149-51.

on "numerous occasions" about the importance of calling customers and references.  *Id.* at 147-49, 215, 349, 353;

16. "Basically [McGlocklin] asked [Davis] to explain his call-through to [McGlocklin],why it was not completed properly.  Went over it with him. Showed him a couple different pages on it, you know, that were a couple different examples that were not completed correctly.  Talked to him about it."  Tr. 352. Davis responded that "he did not feel like he needed to call the references."  *Id.* at 353.  McGlocklin informed Davis "[t]hat it's company policy that we have to call the references.  You know, that's one of the main tools we have of communication for the customers that we're trying to get in contact with, and it has to be done." *Id.*;

17. McGlocklin concluded from the meeting that Davis "was not going to call the references that [McGlocklin and Thrash] were asking him to call and that he was required to call."  Tr. 364.  Moreover, Davis never conveyed to McGlocklin that he planned to call the references later that day.  *Id.* at 367;

18. Nonetheless, apparently, Davis planned to call some of the references at times convenient for them later that day, but did not indicate this fact on the call list McGlocklin reviewed because:

we had a way to notate do not call a reference, period.  But we didn't

have a way to notate don't call them till a certain time, or don't call them before this time, other than handwritten notes and stuff like that. So that was what seemed to have been the big confusion with regards to my call book is that I did not call all of those references . . . on my morning call-through.

*Id*. at 149.  Davis made these notations on earlier call lists and did not have the opportunity to transfer his notes to the new call list that came out that Monday. *Id.* at 260-61.  Consequently, when McGlocklin looked at Davis' log book, according to Davis, the log book would "not necessarily" have had notes indicating that a particular reference requested that Davis call at a specified time. *Id.*;

19. Davis received training on how to maintain his log book to ensure that his call lists were up to date and accurate.  Tr. 189-90.  CAMs are required to make notations on their call lists about efforts to contact customers or references. *Id.* at 354.  An accurate log book allows anyone picking it up to know what calls to make or which customers needed follow up.  *Id*. at 190;

20. When McGlocklin asked Davis to sign the write-up, Davis told McGlocklin that the write-up "was a lie," that he made the proper calls and that McGlocklin "can go through and pick whoever you want to.  I can tell you what's going on with them. I'm in touch with or I know what's going on with every one of my customers." Tr. 147.  Therefore, Davis refused to sign the write-up.  *Id.* at 222; *see also* p. 152;

11

21. Consequently, McGlocklin and Thrash left the conference room to talk to Crumbley "[b]ecause [Davis] told me that he was not going to -- didn't feel like he needed to call the references and basically that he was not going to call the references.  You know, and then with something like that coming up, basically refusing to do the job that is required and that is expected of you, then I went and contacted Ronnie Crumbley."  Tr. 355. McGlocklin "[t]old [Crumbley] everything that had happened in detail."  *Id.* at 356.  Thrash "expressed that it was not going to work out, were his exact words."  *Id.*  Crumbley recommended "[t]hat Mr. Davis be terminated" and instructed McGlocklin "[t]o terminate Mr. Davis."  *Id.* at 357;

22. Thereafter, McGlocklin and Thrash returned to the conference room and McGlocklin discharged Davis.  *Id.* at 153, 223, 359.  Davis asked McGlocklin if the discharge was due to Davis' refusal to sign the write-up and McGlocklin responded that "it was just business."  *Id.* at 225; *see also* p. 359 (McGlocklin testimony that Davis "asked me if he had signed the write-up, would he still have been terminated" and McGlocklin responded "that the decision had been made and that it was business."); and

23. Davis socialized with McGlocklin after his discharge and does not fault McGlocklin for the discharge, which he believes Crumbley dictated.  Tr. 198,

12

226, 362-63.

**B.    Conclusions of Law**

Based on the findings of fact, the court concludes that Davis failed to carry

his burden of establishing that Aaron's discharged him because of his race.

Accordingly, judgment is rendered in favor of Aaron's.

1.    <u>Davis can establish a prima facie case of race discrimination</u>

As it relates to the prima facie case, Aaron's contends that Davis cannot

establish that Aaron's treated a similarly situated non-minority employee more

favorably or that it replaced Davis with someone outside the protected class.  In

making these assertions, Aaron's overlooks that the Supreme Court has stated that

the prima facie case may be established in a number of ways and that "the prima

facie case method . . . was never intended to be rigid, mechanistic, or ritualistic."

*U. S. Postal Service Bd. of Governors  v. Aikens,* 460 U.S. 711, 715 (1983)

(citations and quotations omitted).  In that respect, while showing that an employer

treated similarly situated individuals more favorably is one way of establishing a

prima facie case, another method is for the plaintiff to show that he did not engage

in the alleged conduct that led to his discharge.  *Jones,* 874 F.2d at 1540.

Consistent with the Findings of Fact, while it was not what Davis actually

conveyed to McGlocklin and Thrash, this court finds that Davis never refused to

13

do his call-throughs; rather, Davis concluded it served Aaron's interests to call the references who requested that he do so at the specific times they requested. Therefore, Davis has succeeded in making a prima facie case.  After all, "[d]emonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted).

> 2.  <u>Davis failed to meet his burden of establishing that Aaron's reasons for his discharge are pretextual or that Aaron's discharged him because of his race</u>

Although Davis established a prima facie case, his claim fails because, ultimately, he failed to show that racial animus motivated his discharge.  Rather, this is the quintessential case of a misunderstanding.  As Davis acknowledges, the call log McGlocklin reviewed had no notations on it and suggested clearly that Davis had not called the references.  Tr. 214, 260-61.  To make matters worse, when McGlocklin raised the issue, Davis confounded the situation by responding, "I'm not going to call somebody in the morning when they've told me not to call them."  Tr. 216; *see also* p. 220.  While Davis asserts his comment was "taken out of context," *id.* at 216, was "just an arbitrary example," *id.* at 220, and that he did not mean he "was not calling references or that [he] would not call references or that [he] refused to call references," *id.*, Davis acknowledges however that the

phrase was "maybe a poor choice of words even to use in an example," *id.*

Regardless of what Davis intended to convey, McGlocklin concluded from Davis'

statement that Davis would not call references and, accordingly, relayed this

information to Crumbley. *Id.* at 297-98; *see also* 355-56.

Based on the court's evaluation of the evidence and the credibility of the

witnesses, the court finds that McGlocklin had a reasonable basis to conclude that

Davis conveyed that he would not call references.  That it may be unfair or

erroneous for McGlocklin to reach this conclusion, as Davis contends, does not

transform Davis' discharge to one motivated by racial animus, especially, where,

as here, Davis does not accuse McGlocklin of any racial bias, socialized with

McGlocklin, and even visited McGlocklin after the discharge. *Id.* at 198, 362-63.

Moreover, the court must analyze this case based on the information McGlocklin

conveyed to Crumbley, rather than what Davis contends actually happened in the

conference room.  In that respect, Crumbley described the conversation as follow:

> Q. As best you can recall, can you tell us what Mr. McGlocklin said
> to you when Mr. Davis was terminated?  It's my understanding you
> were called before he was terminated?
>
> A. Yes, by him and Mr. Thrash. That they had reviewed the call list.
> And this is not verbatim, but that they had reviewed the call list and
> that it wasn't -- it wasn't up to par.  References weren't being
> contacted. Calls weren't being made correctly.  So Brian and Mac
> was going to write him up.  And they did write him up for it.

And then when discussing the write-up, Mr. Davis informed them that he didn't think that it was -- that he needed to call the references. He didn't think that it was right to contact them. Or I don't know the exact verbiage that he used but that he was not planning on calling the references. He was not going to change his behavior to improve the CAM office. And that -- and again, that was very disappointing because I believed that he would follow policy in order to succeed in his job –

*Id.* at 300. Based on this report, which Thrash failed to contradict, Crumbley had no reason to doubt McGlocklin's veracity. In fact, Thrash conveyed during the conversation that Davis would not work out as a CAM.[4]  *Id.* at 356. Faced with an unchallenged report from a regional manager that Davis flat out refused to perform a critical aspect of his position, Crumbley's decision to discharge Davis was reasonable and justified under the circumstances.

> a.    *Davis failed to establish that Aaron's treated similarly situated employees more favorably*

To support his claim and to show that Crumbley's reasons for discharging him are pretextual, Davis identified four purported similarly situated individuals outside of his protected class, Randy Carruth ("Carruth"), Chris Stephens ("Stephens"), Scott Richardson (Richardson"), and McGlocklin, that Davis

---

[4]At trial, Thrash testified that Davis never refused to call references. Tr. 105. However, at the time of the discharge, Thrash provided a contemporaneous statement and signed another in which he stated the opposite. Tr. 106, 123-24, 358-59. Thrash's trial testimony that he did not agree with the two statements or that he signed them because he did not want to get in trouble was not credible.

contends Crumbley treated more favorably.  Doc. 46 at 9 - 12.  The court will address each of these alleged comparators below.  However, as a threshold matter, "[t]o make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562 (citations omitted). This requirement necessarily "prevent[s] courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia*, 171 F.3d at 1368.  The law is clear that "[t]he comparators must perform jobs similar to the plaintiff's.  Thus, the plaintiff must show that, in h[is] job, []he shared the same type of tasks as the comparators." *Cooper*, 390 F.3d at 735(internal quotation omitted).  Significantly, the plaintiff must show that he "fell within the primary responsibility of [the same] one middle manager and the same supervisory chain of command []" as the purported comparators. *Anderson*, 253 F.3d at 566.  The requirement for a common supervisor is important because "[c]ourts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." *Jones*, 874 F.2d at 1541 (citations omitted).

Turning now to Davis' purported comparators, the court finds that Davis failed to meet his burden of establishing that the four are "similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562.

i.    *Randy Carruth*

Davis maintains that Aaron's treated Carruth more favorably by failing to discharge Carruth even though Carruth received four write-ups in April 2005 as a CAM.  Consequently, Davis maintains.  Unfortunately for Davis, Carruth is not a proper comparator because Crumbley had no supervisory oversight over Carruth in April 2005.  Tr. 324, 334.  Moreover, Carruth reported to a different regional manager and had no supervisors or middle managers common to Davis when he received the four write-ups.  *Id.* at 310 - 317.  Indeed, Carl Tilly, who made the decision to issue Carruth the write-ups instead of discharging Carruth, *id.* at 312-314, is not an individual Davis alleges played any role in Davis' discharge.  Therefore, Davis cannot rely on the April 2005 write-ups to show pretext.

Perhaps because Davis recognizes that he cannot fault Crumbley for the decision to retain Carruth in April 2005, Davis maintains instead that Crumbley's decision to promote Carruth to general manager in October 2005, and to then give Carruth two years to try to succeed in the position, is evidence of discriminatory treatment.  This argument fails for several reasons.  First, Crumbley did not review Carruth's personnel file as part of the decision to promote Carruth.  Tr. 310, 312.  Instead, Crumbley promoted Carruth based on what he observed about Carruth's performance after Crumbley became the regional manager:  "Based on what I had

experienced from the time I was there till I promoted [Carruth]," *id.* at 312, "[i]n my opinion, [Carruth] had the skill set to do the job," *id.* at 316. *See also* pp. 310-11. Critically, Davis does not rebut Crumbley's contention that Carruth's numbers were among the best in the region at the time of his promotion: "He was a great customer accounts manager. He ran some of the best numbers as customer accounts manager under my watch." *Id.* at 316; *see also* p. 320 ("He was a great CAM. He actually ran some very good numbers in one of those stores that was particularly high, as a CAM."). Instead, Davis rests his pretext argument solely on the false premise that an individual with disciplinary write-ups can never excel sufficiently to the point where they earn a promotion subsequently. This assertion is contrary to one of the intended purposes of employee counseling and coaching, i.e., performance improvement. Moreover, that Carruth failed as a general manager does not mean that Carruth was not qualified for the promotion or that Crumbley made the decision for racial reasons.[5] As Crumbley testified, although

---

[5]Since Davis argued at trial also that Carruth's failure as a general manager suggests that he was not qualified for the promotion, the court adds that:

> Because an employer's intent is measured at the time it makes the challenged employment decision, the post-decision performance of either the plaintiff or the more favorably treated employee is generally not relevant . . . . While such evidence may demonstrate that the employer's business decision was ultimately right or wrong, it does not show whether the decision was justified at the time it was made and therefore whether discriminatory animus may be inferred.

*Rifkinson v. CBS, Inc.*, No. 94-Civ-7985-KTD-JCF, 1997 WL 634514, at *6 (S.D.N.Y. Oct. 14,

Carruth was an excellent CAM, unfortunately that skill set did not translate well for Carruth when he became a general manager: "Organizationally as a GM, though, there was a lot more paperwork, a lot more follow-up. And he just – his place in life was as a customer accounts manager, not as a general manager."  Tr. 316.

Finally, as to the purported preferential treatment Carruth received as a general manager, i.e., demotion back to CAM instead of termination, Davis held a lower level position and, as such, cannot compare himself to Carruth because "[t]he comparators must perform jobs similar to the plaintiff's . . . [and] the plaintiff must show that . . . [he] shared the same type of tasks as the comparator[]."  *Cooper*, 390 F.3d at 735 (quotations marks omitted).  Moreover, performance deficiencies are different from purportedly refusing to perform a key function of a position.  As Crumbley testified when questioned about why he did not discharge Carruth, Carruth "never refused to do his job."  Tr. 317.  When pressed further on why he gave Carruth two years to try to succeed as a general manager, Crumbley added:

> Well, let me tell you a little bit about that. Mr. Carruth ran a store that was in a high-crime area.  He'd been robbed twice with a gun put to his head. He didn't go home.  He never refused to do anything.  He

---

1997) (citing *Crawford v. W. Electric Co.,* 745 F.2d 1373, 1378–79 (11th Cir.1984); *Ross v. Buckeye Cellulose Corp.,* 980 F.2d 648 (11th Cir.1993)).

never refused to follow through with his job description.  He was just
not organized.

He didn't -- the second time that he got robbed with a gun to his head,
he did not say, "I quit. I'm not doing this anymore."  He said, "I need
to shake this off," and he came back to work.

*Id.* at 321.  As for Davis, Crumbley distinguished Davis from Carruth by testifying

that Davis "quit fulfilling the obligations of the job description.  I can't imagine

going in and telling my boss, 'I'm a divisional sales manager. I'm just not going to

concentrate on sales today.' I wouldn't have a job.  It's not based on anything but

the fact that I refused to do what I'm supposed to do, what I get paid to do."  *Id.* at

322.

    In short, based on the information Crumbley received from McGlocklin, and

which Thrash did not rebut, Crumbley had a reasonable basis to believe that Davis

refused to call the references of his delinquent accounts.  Davis presented no

evidence to show that Carruth purportedly refused to do his job.  Therefore, even

if Carruth and Davis held the same job, Carruth would still not qualify as a

comparator.

               ii.    *Chris Stephens*

    Davis maintains that Crumbley treated Stephens more favorably because

Crumbley talked to Stephens first about Stephens' refusal to do his job before

discharging Stephens.  Like Carruth, Stephens held a different position from Davis

and, in fact, unlike Davis, reported directly to Crumbley: "He was an assistant

regional.  He was much like Gordon McGlocklin . . . So he wasn't assigned to a

particular store."  Tr. 304.  As Crumbley's assistant regional, Stephens "stepped in

for [Crumbley] in [Crumbley's] absence."  *Id.*  For example, Crumbley discharged

Stephens when Stephens failed to complete an inventory at a store that Crumbley

assigned to him because the store had no general manager:

> And I specifically asked Chris to complete the inventory.  And he had
> indicated to -- to co-workers and -- that it wasn't his job to do that
> after I specifically asked him to do it.

> When I come back, I asked about the inventory.  He said he didn't
> feel like [it was] his job.  He said he didn't plan on doing it and
> basically refused to do it, and I terminated him.

Tr. 303.  Because Stevens held a different position and performed different duties

than Davis, he is not similarly situated to Davis.  *See Cooper*, 390 F.3d at 735.

Significantly, Crumbley testified that he treated Stephens no differently than Davis

– i.e., he had no option but discharge since both refused to do their jobs:

> A. There was no benefit of the doubt.  It was, "Why did you not do
> this inventory as I asked you to do?"  Because it was a policy, and he
> knew that it had to be done.  Yet he refused to do it. I had no other
> option with Chris Stephens.  No other option.

> Q. Did you have any other option with Mr. Davis?

A. When he refused to do his job, no.

*Id.* at 323.

Finally, as to Davis' contention that Crumbley treated Stephens more favorably by hearing Stephens' side of the story, Davis overlooks that Stephens reported directly to Crumbley and, as a result, Crumbley could only gather facts by speaking to Stevens.  Moreover, as it relates to this incident, Crumbley did not seek Stephens out for a special meeting.  Rather, because Stephens "stepped in for [Crubmley] in [Crumbley's] absence.  So [Crumbley] had to speak to him that day when [Crumbley] came back off vacation to see what was going on in the region. [Crumbley] ha[d] to get updates on the region." Tr. 304.  In contrast, Crumbley had no business reason to speak to Davis and instead gathered the facts he needed from speaking to Davis' supervisors, Thrash and McGlocklin.  For all these reasons, Stephens is simply not similarly situated to Davis.

### iii.   Scott Richardson

As it relates to Richardson, Davis maintains that Crumbley treated Richardson more favorably than Fran Welsey, an African American, when both failed to secure gas cards as general managers.  Apparently, Welsey received a demotion and Richardson did not.  Tr. 158-161.  Davis' reliance on Richardson falls short for several reasons.  First, Richardson committed a different infraction

than Davis and held a higher level position and, as such, is not similarly situated to Davis. *See Holifield*, 115 F.3d at 1562; *Cooper*, 390 F.3d at 735.  Second, assuming that Davis can even point to Richardson's alleged favorable treatment compared to someone other than Davis to support Davis' claims, Davis' reliance on Richardson fails because Aaron's presented evidence that Crumbley had no knowledge of or involvement in Richardson's discipline, which occurred during Crumbley's vacation.  Tr. 335, 341.  Moreover, Aaron's showed also that Crumbley warned Welsey first about securing the gas card and only demoted Welsey when the same infraction occurred again.  Tr. 159-60, 335, 341, 421.  In fact, Davis testified that he was present on one occasion when Crumbley counseled Wesley about securing the gas card.  *Id.* at 231-32.  In other words, Davis failed to establish that Richardson is a proper comparator.

> *iv.    Gordon McGlocklin*

As a final comparator, Davis claims that McGlocklin, the regional CAM who informed Davis of his termination, received months to fix problems at the Roebuck store McGlocklin managed after his demotion from regional CAM. Davis' reliance on McGlocklin fails for several reasons.  First, Wallie Russell ("Russell"), who replaced Crumbley as regional manager, Tr. 423, made the decision about McGlocklin that Davis challenges, *id.* at 363.  Russell had no

involvement in Davis' discharge and, consequently, Davis cannot rely on Russell's decisions to prove Davis' claim.  Second, Russell is African American, *id.* at 333, and, as such, Davis faces a difficult hurdle establishing that Russell purportedly treated McGlocklin more favorably for racially discriminatory reasons.  *See, e.g., Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (A plaintiff "faces a difficult burden [of establishing age discrimination] because all of the primary players behind [the decisions she challenges]. . . were well over age forty and within the class of persons protected by the ADEA. These [individuals] are more likely to be victims of age discrimination than its perpetrators.") (emphasis added); *but see Oncale v. Sundowner Offshore Serv., Inc.*, 523 U. S. 75, 78 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.") (quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977)).  Third, again, Davis simply cannot claim that he is similarly situated to a general manager because general managers perform different duties and are not similar to CAMs in all relevant aspects.  *See Cooper*, 390 F.3d at 735.  As Crumbley testified, he held general managers to a different standard because they are "responsible for the overall operation of the store and the profitability of the location."  Tr. 335.  Finally, again, performance deficiencies

are distinct from the purported refusal to perform a critical aspect of a position.

Therefore, McGlocklin's performance deficiencies are not nearly identical to

Davis' refusal to make call-throughs.  In short, McGlocklin is also not similarly

situated to Davis for multiple reasons.  Therefore, Davis' reliance on the treatment

of McGlocklin to establish pretext fails.

>    b.   *The alleged retaliatory nature of Davis' discharge does not*
>         *help Davis establish his race discrimination claim.*

Although Davis is over only pursuing a discrimination claim in this lawsuit,

Davis believes apparently that Aaron's discharged him, in part, to retaliate against

him for responding to an email from Crumbley.  Tr. at 99-102, 140-43.  However,

even if Davis had pled a retaliation claim, Davis' email response does not qualify

as protected activity because Davis never once raised alleged discrimination in the

email.  *Id.* at 140-43.  Rather, Davis simply challenged Crumbley for unfairly

accusing Davis of not doing his job.[6]  *Id.*  Moreover, the allegation of retaliation,

even if true, does not help Davis prove his discrimination claim.  *See, e.g.,*

*Sullivan v. City of Satsuma*, No.-Civ-A-040473-WSM, 2005 WL 2206222, at *10

(S.D. Ala. Sept. 6, 2005) ("The merits of the retaliation claim are distinct from

those of the underlying race discrimination claim."); *Sullivan v. Nat'l R.R.*

---

[6]As an aside, Crumbley did not think Davis' email was inappropriate and Crumbley agreed with some of the content.  Tr. 295.

*Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) ("[R]etaliation is a

separate offense under Title VII; an employee need not prove the underlying claim

of discrimination for the retaliation claim to succeed.").  Finally, if, in fact, Davis

is correct that retaliatory animus caused Crumbley to discharge him, – an

allegation Crumbley denies, Tr. 297-98, this assertion would undermine Davis'

discrimination claim and would provide a secondary reason for this court to rule

for Aaron's.

> c.   *Davis' denial that he engaged in the alleged conduct or Aaron's refusal to give Davis more time to improve the Midfield non-renewal numbers do not transform Davis' discharge to unlawful race discrimination*.

In the end, judgment is due for Aaron's because Davis failed to meet his

burden of establishing that discriminatory animus factored in his discharge.  It is

clear that Crumbley discharged Davis because he received a report from

McGlocklin and Thrash that Davis refused to call references.  Davis attempts to

meet the reason head on, *see Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305,

1308 (11th Cir. 2007) (citation omitted), in part, by denying the allegation and by

also pointing out that Aaron's gave him insufficient time to turn things around in a

very bad location.  However, none of Davis' contentions carry his burden.

Ultimately, although the court agrees with Davis that he inherited a herculean task

that required more than just a few weeks to rectify, this belief does not dictate a

finding that Aaron's discharged Davis because of his race.  As the Eleventh

Circuit has said,

> [F]ederal courts "do not sit as a super-personnel department that
> reexamines an entity's business decisions.  No matter how medieval a
> firm's practices, no matter how high-handed its decisional process, no
> matter how mistaken the firm's managers, [federal law] does not
> interfere.  Rather our inquiry is limited to whether the employer gave
> an honest explanation of its behavior."

*Chapman*, 229 F.3d at 1030 (citing *Elrod*, 939 F.2d at 1470).

Likewise, that the court agrees with Davis that Davis did not intend to

convey that he would not call references also does not establish that Aaron's

discharged Davis because of his race. After all, "[f]or purposes of Title VII

analysis, it is thus of no consequence that [plaintiff] now disputes the charges.

The law is clear that, even if a Title VII claimant did not in fact commit the

violation with which he is charged, an employer successfully rebuts . . . [his

challenge] by showing that it honestly believed the employee committed the

violation."  *Jones*, 874 F.2d at 1540. Indeed, as the Eleventh Circuit has

emphasized:

> [Plaintiff] argues at length that . . . [her employer's] complaints about
> . . . her work were unfounded, but the fact that . . . [the employee]
> thinks more highly of [his] performance than [his] employer does is
> beside the point.  The inquiry into pretext centers on the employer's

> beliefs, not the employee's beliefs, and to be blunt about it, not on
> reality as it exists outside of the decisionmaker's head. The question
> is not whether it really was [plaintiff's] fault that assignments were
> not completed . . . The question is whether her employers were
> dissatisfied with her for these or other non-discriminatory reasons,
> even if mistakenly or unfairly so, or instead merely used those
> complaints about [plaintiff] as cover for discriminating against her
> because [of] her . . . [race].

*Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)

(citations omitted).  Based on the evidence presented at trial, it is undisputed that

McGlocklin reported to Crumbley that Davis refused to call references.  Tr. 300,

355-56.  Moreover, Davis presented no evidence at trial to show that McGlocklin

fabricated this report for racial reasons.  In fact, Davis testified that McGlocklin

reached that conclusion based on a misunderstanding.  *Id.* at 216-220.  Therefore,

Davis failed to meet his burden of establishing that Aaron's discharged him

because of his race.

Ultimately, regardless of whether Davis agreed with Aaron's policy that he

call a reference even when the reference requested a call at a different time, as

Davis acknowledged, (1) it is "feasible" for Aaron's to expect employees to

perform the job in the manner Aaron's wants it performed whether the employee

agrees or disagrees; (2) there is a clash if the employee thinks she has a better way

to do a job and the company disagrees; and (3) in such a case, "it's possible" that

separation is the best solution.  Tr. at 236-237.  That Davis may think it is unfair to discharge him, *id.* at 237, or that McGlocklin misconstrued Davis' response or purposely reported the wrong information to Crumbley, is irrelevant because "Title VII addresses *discrimination* . . . Title VII is not a shield against harsh treatment at the workplace."  *Nix*, 738 F.2d at 1187 ((internal citations and quotation marks omitted) (emphasis in original)).

Finally, the court notes that Crumbley promoted Davis to CAM on March 10, 2008, and made the decision to discharge Davis a few weeks later on May 27, 2008.  When the "same actor" is involved in both a positive and an adverse employment action, "these facts may give rise to a permissible inference that no discriminatory animus motivated the [employer's] actions."  *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) (citing *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class.")).  Crumbley's promotion of Davis a few weeks earlier undermines Davis' assertion that Crumbley discharged him because of Davis' race.  Although this inference of non-discrimination is not mandatory, it is especially appropriate where, as here, Crumbley also discharged a white CAM, Emory Godfrey, Tr. 303, 333, and discharged Davis only after he received a report

from two managers that Davis stated that he would not call references.

## IV.  CONCLUSION

Based on these findings, the court, sitting as the trier of fact and law,

concludes by a preponderance of the evidence that Davis failed to establish that

Aaron's discharged him because of his race.  Accordingly, the court finds in favor

of Aaron's and against Davis.

**DONE** and ordered the 6th day of April, 2012.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE